IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

ANDREW C. NEAL, JR,

   Plaintiff,

v.            No. 3:20-cv-00200-JJV

STATE OF ARKANSAS, *et al.*

   Defendants.

# MEMORANDUM AND ORDER

## I. INTRODUCTION

Andrew C. Neal, Jr. ("Plaintiff") was an inmate at the Sharp County Detention Center when he filed this action *pro se* pursuant to 42 U.S.C. § 1983. Only Plaintiff's conditions of confinement claim against Sharp County Sheriff Mark Counts, and conditions of confinement, retaliation, and equal protection claims against Sharp County Jail Administrator Serena Martin, remain pending; Plaintiff's remaining claims have been dismissed. (Doc. Nos. 11, 17.) P

Defendants Counts and Martin (collectively "Defendants") now have filed a Motion for Summary Judgment. (Doc. Nos. 58-60.) Plaintiff has not responded, and the time for doing so has passed; this matter is ripe for a decision. After careful consideration, Defendants' Motion will be granted.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the

record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A).

When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

## III. ANALYSIS

Defendants maintain there are no genuine issues of material fact in dispute. I note at the outset that Plaintiff has not filed a response to Defendants' Motion. Plaintiff has not controverted any material fact set forth by Defendants in their statement of undisputed material facts. Accordingly, all material facts submitted by Defendants (Doc. No. 60) are deemed admitted. Local Rule 56.1(c) of the Eastern and Western Districts of Arkansas; FED. R. CIV. P. 56(e).

### A. Personal Capacity Claims

Plaintiff makes conditions of confinement, retaliation, and equal protection claims.

1. **Qualified Immunity**

Defendants contend they are entitled to qualified immunity on Plaintiff's personal capacity claims against them. (Doc. No. 59 at 23.) Qualified immunity protects government officials who acted in an objectively reasonable manner and shields an official from liability when his or her conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is a question of law, not a question of fact. *McClendon v. Story Cty. Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005). Thus, issues concerning qualified immunity are appropriately resolved on summary judgment. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (the privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial").

To determine whether defendants are entitled to qualified immunity, courts generally consider two questions: (1) whether the facts alleged or shown, construed in the light most favorable to the plaintiff, establish a violation of a constitutional or statutory right; and (2) whether that right was so clearly established that a reasonable official would have known that his or her actions were unlawful. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009) (quoting *Pearson*, 555 U.S. at 236). Defendants are entitled to qualified immunity only if no reasonable fact finder could answer both questions in the affirmative. *Id.*

### B. Plaintiff's Claims

#### 1. Conditions of Confinement

Plaintiff alleged Defendants subjected him to unlawful conditions of confinement. Plaintiff indicated that at the time he filed his Amended Complaint, he was in custody but had not been convicted of a crime. (Doc. No. 9 at 10.) A pretrial detainee's conditions of confinement claim is governed by the standard set out by the United States Supreme Court in *Bell v. Wolfish*, 441 U.S. 520 (1979). *Stearns v. Inmate Services Corp.*, 957 F.3d 902, 907-08 (8th Cir. 2020). As announced in *Bell*, pretrial detainees are protected under the Due Process Clause of the Fourteenth Amendment from conditions of confinement that amount to punishment. *Bell*, 441 U.S. at 535. Conditions amount to punishment under *Bell* if the conditions are intentionally punitive, were not reasonably related to a legitimate governmental purpose, or were excessive in relation to that purpose. *Stearns*, 957 F.3d at 907. Mere negligence is insufficient to support a claim under *Bell*. *Id.* at 908 n.5.

##### a. Drinking Water and Leaky Toilet

According to Plaintiff, Defendant Martin housed him in a cell into which sewer water was leaking. (Doc. No. 9 at 14.) Plaintiff also asserted he had no fresh water to drink or with which to wash his hands. (*Id.*) Plaintiff alleged Defendant Martin violated Covid-19 quarantine and exposure protocols. (*Id.* at 13.) He further alleged Defendant Martin released female detainees, but not male detainees. (*Id.*)

Plaintiff has failed to establish a material fact in dispute as to Defendant Martin.

A July 10, 2020, grievance filed by Plaintiff provided:

@ 4:04 PM Bobby Glenn came into B Block with trustee Jason and demanded and took my only fresh water supply out of my cell which is a one (1) gallon pitcher of H2O (water), and stated that I could have water back in my cell at lockdown which is at 10:00 PM at night, and that the shower was open for me to retrieve water from,

> (which was only open because it was a shower day – Monday-Wednesday-Friday, but Bobby Glenn refuses to unlock shower on a non shower day), for coffee. Minutes later I asked if the water pitcher from C block, the response was "No!", but C block is closer to booking area. @ 4:34 PM I witnessed personally Bobby Glenn walking thru doorway with pitcher of water from C block, I told Deputy Grady and Jim Beach I want to press charges against Bobby Glenn along with federal charges of Guatanimo Bay Act violations. Deputy Grady never spoke
> with me. With a lawsuit pending.

(Doc. No. 60-3 at 35.)

Plaintiff filed another water-related grievance on July 24, 2020, after this case was filed.

(*Id*. at 38.)  That grievance reads:

> Bobby Glenn said he wasn't required to pass out O.T.C.'s and I said "Like you're not required to give water to 3 detainees, Jeffery, Krumm, and myself?" And Bobby said, well I gave you water. And I then replied, "yeah 3 cups of water is all you would allow Rusty (a trustee then) to give to us. Thru the bing hole and 3 cups were set right here pointing placement out, Bobby sat my water pitch on table in B Block and went to disguise this with me and I told him I have a calendar with it marked in the first week of March and I told him like in original grievance that he (Bobby) said "well you don't looked parched!" and Bobby Glenn chuckled and said "you have a damn good memory, I'll give you that!" And Bobby Glenn walked out the door of B Block, I then stated "How bout that!" This is when B Block had 8 hrs. out and shared the day room. So lockdown was 16 hours without water. Bobby Said, "I'm not carrying 3 bottled with me, "talking about O.T.C's.

(*Id*.)

Both grievances reflected a period of hours during which Plaintiff says he did not have a water pitcher in his cell.  The first grievance noted Plaintiff could retrieve water from the shower.  In the second grievance, Plaintiff claims he had no water during the 16-hour lockdown.  Neither grievance, however, reflected any action or inaction by Defendant Martin.  And Plaintiff has not come forward with any evidence that Defendant Martin had any involvement with the pitcher of drinking water—or lack thereof—in Plaintiff's cell.  The same holds true for Defendant Counts.

5

While access to drinking water is a necessity, *Scott v. Carpenter*, 24 Fed. Appx. 645, 647 (8th Cir. 2001), for Defendant Martin or Defendant Counts to be liable for any alleged violation, Plaintiff must demonstrate their involvement in that violation. But he has not.

As to a sewage leak, Plaintiff claimed he used toilet paper and a bath towel to absorb "sewer water" so it would not ruin his legal documents. (Doc. No. 9 at 14.) Defendant Martin observed that Plaintiff had a small leak from his toilet sometime in July 2020. (Doc. No. 60-1 at 1, ¶¶ 6-7.) Parts were ordered to fix the leak. (*Id*. at 2, ¶ 8.) The leak was repaired within one month of Plaintiff informing Defendant Martin of the problem. (*Id*.) In the meantime, there was no water standing on the floor in Plaintiff's cell. (*Id*. at 1-2, ¶ 7.) The towel Plaintiff put on the floor completely absorbed the water. (*Id*.)

Plaintiff alleged that he had a leaky toilet in his cell. He did not specify if the leak was a clean water leak or whether human waste was leaking into his cell. Based on Plaintiff's own pleading, he was able to control the leak with towels placed around the toilet. And Defendant Martin ordered replacement parts and had the leak fixed. Plaintiff has not produced evidence that the conditions in his cell amounted to punishment; he has not come forward with evidence that creates a genuine issue of material fact. Accordingly, Defendant Martin is entitled to qualified immunity on this claim, as is Defendant Counts, to the extent Plaintiff made similar allegations against him.

### b. Covid-19 Protocol

Plaintiff also alleged insufficient Covid-19 protocols. In his Amended Complaint, Plaintiff alleged Defendant Martin did not implement quarantine and exposure protocols. (Doc. No. 9 at 13.) Plaintiff also alleged generally a lack of "purifiers, bacteria showers, and recpirators [sic]." (Doc. No. 9 at 11; Doc. No. 1 at 12.)

As an initial matter, the Detention Center operated in compliance with the Arkansas Jail Standards. (Doc. No. 60-1 at 3, ¶ 21.) The Detention Center had in place procedures to limit the exposure of an inmate to any communicable disease. (Doc. No. 60-5 at 9.) Pursuant to that policy, newly admitted inmates go through a preliminary health screening. (*Id*. ta 9.) Any inmate who appears to be suffering from a contagious disease is placed in administrative segregation until the inmate has been examined by a licensed physician, who then recommends how the inmate should be handled further. (*Id*. at 9-10.)

Further, Defendants point out that the Detention Center had in place a Covid-19 isolation protocol. (Doc. No. 60-5 at 22.) Pursuant to that policy, staff was instructed to follow CDC guidelines. (*Id*.) If an inmate showed Covid-19 symptoms, staff was directed to "contact NURSE Stephen Davis first and advise of symptoms then follow as he recommends, if symptoms become critical contact EMS and advise EMS of Covid-19 specific symptoms." (*Id*.) Staff was required to wear a face mask and gloves when coming into contact with possible Covid-19. (*Id*.) When cleaning an area in which an inmate had been housed in isolation, staff was required to wear a face mask and gloves. (*Id*.) Disposable plates were used for meals. (*Id*.) Further, "[o]nly confirmed cases should be housed together and only if necessary." (Doc. No. 60-5 at 22.) If an inmate was in insolation, but had not been confirmed as having Covid-19, the inmate was monitored twice daily. (*Id*.) Staff that had contact with inmates in isolation were monitored twice daily, even when the staff members were not at work. (*Id*.)

The Detention Center also had in place a quarantine protocol. If an inmate displayed Covid-19 symptoms and was moved to isolation, then the entire housing unit was quarantined for up to 14 days, with each inmate's symptoms monitored twice daily. (*Id*.) Further, as of May 1, 2020, new inmates were quarantined for up to 14 days. (*Id*. at 23, 24.) This protocol was issued

7

by Defendant Martin. (*Id*. at 24.) Movement between cells was kept to a minimum. (Doc. No. 60-5 at 22.) Inmates were to be kept separated as much as possible, and if an inmate began showing symptoms, the inmate was to be isolated. (*Id*.) Disposable plates were used for meals. (*Id*.) Staff was directed to wear a face mask and gloves while in the quarantine unit, and was monitored twice a day. (*Id*.)

The Detention Center provided inmates with bleach water daily so the inmates could spray down the surfaces that are frequently touched. (*Id*. at 24.) Floors in the Detention Center were mopped twice daily with bleach water. (*Id*.) Before any inmate was released off lockdown, the inmate's temperature was checked and "if all is well" the inmate was free to join general population. (Doc. No. 60-5 at 24.) Inmates were encouraged to stay six feet away from any quarantined inmate. (*Id*.) As of August 20, 2020, jailers were required to wear a mask any time the jailer entered the back hallway with the inmates. (*Id*. at 25.)

The Eighth Amendment protects convicted prisoners against future harm, and pretrial detainees have rights at least as great as those of convicted prisoners. *Taylor v. Crawford*, 487 F.3d 1072, 1080-81 (8th Cir. 2007); *Smith v. Conway Cnty, Ark*., 759 F.3d 853, 858 (8th Cir. 2014). But there were no Covid-19 cases at the Detention Center while Plaintiff was incarcerated there. (Doc. No. 60-1 at 1, ¶ 5.) As such, potential exposure to Covid-19—Plaintiff's alleged harm—was not a risk during Plaintiff's incarceration. The conditions of Plaintiff's confinement at the Detention Center did not rise to the level of punishment.

Further, Plaintiff did not contract Covid-19 during his incarceration. While Plaintiff seeks "[p]ay for pain and suffering, mental anguish," among other damages, (Doc. No. 9 at 19-20), it is unclear on which actual physical injury Plaintiff could rely in support of his claims. *See* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or

other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . .)

Plaintiff alleged the Detention Center had no or insufficient Covid-19 protocols in place. But the record reflects otherwise. Plaintiff has not come forward with evidence controverting the fact that the Detention Center followed CDC guidelines, as well as having Covid-19 quarantine and isolation protocols in place. Under the circumstances, considering the newness of the virus and developing knowledge about Covid-19 and how it is spread, Defendants cannot be held liable for acting in this gray area. *See Freeman v. City of Desloge, Mo.*, 647 F.3d 841, 846 (8th Cir. 2011). I cannot say Defendants violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Fitzgerald*, 457 U.S. at 818. Thus, even if there was a violation, Defendants would be entitled to qualified immunity on Plaintiff's claims.

2. **Retaliation**

Plaintiff alleged retaliation only as to Defendant Martin. To succeed on his retaliation claim, Plaintiff must establish that he: (1) engaged in protected activity; (2) Defendants took adverse action against him "that would chill a person of ordinary firmness" from engaging in that activity; and (3) retaliation was the motivating factor for the adverse action. *See In re Kemp*, 894 F.3d 900, 906 (8th Cir. 2018); *Lewis v. Jacks*, 486 F.3d 1026, 1028 (8th Cir. 2007).

Plaintiff alleged Defendant Martin retaliated against him for filing lawsuits. Plaintiff filed his Complaint on July 22, 2020; Defendant Martin was served on September 23, 2020. (Doc. Nos. 1, 20.) Plaintiff has not identified any additional lawsuits he has filed against Defendant Martin. Under these circumstances, I cannot find any retaliatory animus on Defendant Martin's part. *See Atkinson v. Bohn*, 91 F.3d 1127, 1129 (8th Cir. 1996). *See also Bitzan v. Bartruff*, 916 F.3d 716, 717 (8th Cir. 2019) (affirming summary judgment where plaintiff did not allege facts connecting

defendants to the challenged actions); *Antonelli v. Tipton*, Case No. 08-3123, 2009 WL 4825169 at *904 (8th Cir. Dec. 16 2009) (per curiam) (plaintiff "failed to state a retaliation claim because he . . . failed to allege which defendants were involved in or affected by his grievances."). As explained in *Rienholtz v. Campbell*, "an inmate cannot immunize himself . . . . merely by filing grievances and then claiming that everything that happens to him is retaliatory." 64 F. Supp. 2d 721, 733 (W.D. Tenn. 1999) (internal citation omitted). "If that were so, then every prisoner could obtain review of non-cognizable claims merely by filing a lawsuit or grievance and then perpetually claiming retaliation." *Id.*

### 3. Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class or the plaintiff must allege a class of one. *Mensie v. City of Little Rock*, 917 F.3d 685, 691-92 (8th Cir. 2019).

Plaintiff alleged Defendant Martin released every female detainee, but would not release male detainees, including Plaintiff. (Doc. No. 9 at 13.) Defendant Martin, as the jail administrator, does not have authority to release inmates that are brought in on felony charges. (Doc. No. 60-1 at 2, ¶ 13.) Defendant does have the authority by law to release an individual on a citation if the person is brought to the Detention Center on a misdemeanor charge. (*Id*. at 2, ¶ 14.) Defendant Counts, however, has the final say as to whether an inmate will be released. (*Id*.) Up to the date

of her Affidavit, Defendant Martin has not released any detainee on a citation on her own. (*Id*. at 2, ¶ 15.) And during Plaintiff's incarceration at the Detention Center, no female detainees were released on a citation. (*Id*. at 3, ¶ 19) While some inmates were released due to Covid-19, Defendant Counts and Circuit Judge Huff, in consultation with the prosecuting attorney, made those decisions. (*Id*. at 2, ¶ 16.) During Plaintiff's time at the Detention Center, any female detainees that were released were released because the detainee bonded out, was sentenced and transferred, or Judge Huff allowed the female detainee to be released on her own recognizance. (Doc. No. 60-1 at 3, ¶ 20.)

Again, Plaintiff has not come forward with evidence to establish that Defendant Martin released female detainees but refused to release male detainees, including Plaintiff. As such, there is no genuine issue of material fact in dispute that would preclude summary judgment in Defendant Martin's favor on this claim.

B.    **Official Capacity Claims**

Plaintiff sued Defendants in their personal and official capacities. Plaintiff has not presented evidence that establishes a genuine issue of material fact in connection with his official capacity claims. Accordingly, summary judgment in Defendants favor on those claims is appropriate.

Where, as here, Defendants have moved for summary judgment, Plaintiff "was required 'to . . . meet proof with proof by showing a genuine issue as to a material fact.'" *Fatemi v. White*, 775 F.3d 1022, 1046 (8th Cir. 2015) (internal citation omitted). Plaintiff has not met his burden; he did not respond to Defendants' Motion and has not established a genuine issue of material fact that prevents entry of summary judgment in Defendants' favor. Accordingly, Defendants' Motion for Summary Judgment will be granted.

**IV. CONCLUSION**

IT IS, THEREFORE, ORDERED that:

1. Defendants' Motion for Summary Judgment (Doc. No. 58) is GRANTED.

2. Plaintiff's claims against Defendants Martin and Counts are DISMISSED with prejudice.

3. This case is DISMISSED.

4. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an *in forma pauperis* appeal from this Order and the accompanying Judgment would not be taken in good faith.

DATED this 8th day of June 2021.

_____
JOE J. VOLPE
UNITED STATES MAGISTRSTE JUDGE